IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BOBBY MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-21-388-D |
| | ) |
| STATE FARM FIRE AND CASUALTY COMPANY, | ) |
| | ) |
| Defendant. | ) |

## ORDER

After discovering a water leak from the toilet in his second story bathroom, Mr. Mitchell contacted a water mitigation company to help him assess the damage to his home. The water mitigation company recommended that an industrial hygienist inspect the property before beginning any work and suggested that this could be a Category 3 water loss, which would require more extensive mitigation work. Mr. Mitchell subsequently reported the damage to his insurer, State Farm. After inspecting the home with its own water mitigation company, State Farm hired an industrial hygienist to assist with its evaluation of the claim. The industrial hygienist agreed that Mr. Mitchell suffered a Category 3 water loss, but when State Farm provided its estimate, it was significantly lower than the estimate provided by Mr. Mitchell's water mitigation company.

Unable to reach an agreement regarding the scope of work necessary to repair the damage, Mr. Mitchell initiated this action in state court asserting claims for breach of contract and bad faith, and seeking punitive damages. State Farm removed the action and

1

now seeks partial summary judgment [Doc. No. 30] as to the bad faith claim and the request for punitive damages. Mr. Mitchell has responded in opposition [Doc. No. 39] and State Farm has replied [Doc. No. 43].

## FACTUAL BACKGROUND[1]

Mr. Mitchell woke in the early morning hours of May 26, 2020 to find water leaking through his ceiling. The water originated from a clogged toilet in the second story bathroom and leaked into several rooms. Mr. Mitchell promptly cleaned up the water and had the toilet repaired by a plumber. *See* Def.'s Ex. 3 at 99-100. He then contacted Covenant Restoration, a water mitigation company, to help him assess and repair the damage caused by the leak. *Id.* Covenant indicated that, prior to beginning the mitigation work, an industrial hygienist should be retained to determine the category of water involved. Covenant's concern was that the water could be considered Category 3,[2] which would involve a more extensive cleaning process and require the Mitchells to move out of the home during the repairs. *Id.* at 98.

---

[1] The facts stated in this section include both undisputed facts stated by Defendant in its supporting brief and additional facts stated by Plaintiff in his response brief, which are undisputed by Defendant in its reply.

[2] Category 3 water is water that is "grossly contaminated" and includes "wasteline backflows that originate from beyond any trap regardless of visible content or color." Category 2 water "contains significant contamination" and can include "overflows from toilet bowls on the room side of the trap with some urine but no feces." Category 1 water "originates from a sanitary water source." Category 1 and 2 water can deteriorate into Category 3 water depending on the length of time that transpires and temperature. *See* Pl.'s Ex. 13 at 13-14.

Mr. Mitchell reported the damage to his insurer, State Farm, on June 11, 2020 and an adjuster promptly contacted him to discuss the claim.³ *Id.* at 99. During this initial conversation, Mr. Mitchell stated that Covenant Restoration would perform the mitigation work and that he would ask them to begin the process. *Id.* However, when the adjuster followed up with Mr. Mitchell a few days later, he indicated that Covenant had not started the mitigation work because they believed an industrial hygienist first needed to assess the property. *Id.* at 98. The adjuster then spoke to a representative at Covenant, who advised that the water was Category 3 because it came from the toilet, and he was concerned about getting approval for the repairs before beginning the mitigation process. *Id.* The claim notes indicate that Covenant agreed to submit a mitigation and repair estimate for review, that it would be "higher than just normal cleaning/drying due to Category 3 water," and that additional living expenses "will be needed" during the repairs. *Id.*

Covenant submitted its initial estimate and photos to State Farm on June 23, 2020. *See* Pl.'s Ex. 15. The estimate encompassed only the mitigation work (not any subsequent build back repairs) and exceeded $17,000. Def.'s Ex. 3 at 97-98. The claim was then reassigned to a new adjuster because it was "clearly" going to exceed $25,000 and needed

---

³ There was a ten-day delay between the date of loss and the date Mr. Mitchell reported the claim to State Farm. The claim notes reflect that the delay occurred because Mr. Mitchell did not realize the full extent of the damage until after the home was inspected by the plumber and Covenant. State Farm determined it "would not penalize" Mr. Mitchell for the late reporting because he cleaned up the water and initially believed the damage was minimal. State Farm also concluded that "[b]y the time the claim was reported, it is likely the home was mostly dry and whatever additional damage done by the delay had been done by then. So from the time of reporting the claim to now, there really shouldn't have been any additional damage incurred." Def.'s Ex. 3 at 81.

"full handling." *Id.* On July 6, 2020, the new adjuster contacted Mr. Mitchell and scheduled an in-person inspection of the home for July 9, 2020. The adjuster also advised Mr. Mitchell that State Farm could not meet with Covenant "due to Covid guidelines." *Id.* at 96-97. In preparation for the inspection, State Farm engaged its own water mitigation company to check for moisture in the home and provide a competitive estimate. *Id.* At this point, State Farm was aware that, although over a month had passed since the water leak, no professional mitigation work had been performed because Mr. Mitchell was purportedly waiting for State Farm's approval to proceed. *Id.*

Mr. Mitchell, the adjuster, representatives from Covenant, and representatives from State Farm's water mitigation company all arrived at the Mitchell house on the inspection date, but things did not go as planned. Mr. Mitchell insisted that a representative from Covenant join them during the inspection, but the adjuster refused to perform the inspection with Covenant present. State Farm contends that the adjuster's refusal was based on his concern that having too many people present in the home would be unsafe given the ongoing Covid-19 pandemic. *See* Def.'s Undisputed Mat. Facts ¶ 10. Mr. Mitchell disputes this explanation, and points to evidence indicating that the adjuster made numerous in-person inspections during this same month (including one where the very same Covenant representative was present), evidence that this adjuster took two out-of-state trips during this time period, and testimony indicating that the true motivation behind refusing to inspect the home was a desire to prevent Covenant from influencing State Farm's water mitigation company during the inspection. *See* Pl.'s Resp. to Def.'s Undisputed Mat. Facts ¶ 10. Although Mr. Mitchell was willing to allow State Farm to inspect the home (so long

as a Covenant representative was present), the adjuster indicated that he would suspend the claims process pending an inspection independent of Covenant. Def. Ex. 3 at 96.

Just a few days later (and following a phone call from Mr. Mitchell to the adjuster's supervisor) the adjuster agreed to proceed with an inspection with Mr. Mitchell, a representative from Covenant, and a representative from State Farm's water mitigation company. Def.'s Ex. 3 at 90-91; 95. State Farm's water mitigation company agreed that the damage could be considered a Category 3 water loss due to the amount of time that had passed and agreed that hiring an industrial hygienist to assess the property was an appropriate next step. *Id.*

Following the inspection and a review of video footage of the leak taken by Mr. Mitchell, the adjuster entered a claim note indicating that the damage was a Category 1 "at the time of loss," that the water looked "clear," that Covenant did not properly map the path of the water when the leak first occurred, that additional living expenses were not warranted because the home was habitable, and that there was very little visible damage. *Id.* Mr. Mitchell disputes the accuracy and relevance of some of these observations. Specifically, he has presented evidence that it is the source of the water leak – not the color – that determines the category of water loss, and that Covenant did identify the path of the water. *See* Pl.'s Resp. to Def.'s Undisputed Mat. Facts ¶¶ 11-13.

In any event, State Farm agreed to hire an industrial hygienist to inspect the property. Def.'s Ex. 3 at 81. The industrial hygienist completed his inspection on August

5

5, 2020 and sent his report to State Farm on August 31, 2020.[4] *Id.* at 78-79. The report concluded that there was no visual evidence of water intrusion at the home, moisture measurements did not indicate elevated moisture in building materials, and laboratory analysis indicated the presence of mold, including one strain known to be a human pathogen and another known to be an allergen to sensitive individuals.[5] Def.'s Ex. 5. The report also found that the leak involved Category 3 water because it "reportedly came from the sanitary sewer." *Id.* Finally, the report recommended that a professional remediation company "remove porous impacted building materials, clean and apply an EPA approved biocide on non-porous materials prior to installing new materials in the 1st and 2nd floors," and that "[r]emediation should be in general accordance with IICRC S500 guidelines and IICRC S520."[6] *Id.*

The S500 is a document written for water mitigation professionals that sets out specific procedures to be followed when performing water damage restoration. Pl.'s Ex. 13 at 12. For example, the S500 indicates that an indoor environmental professional should be used to assess contamination levels when occupants are high risk individuals, when

---

[4] The claim notes indicate that the adjuster contacted the industrial hygienist to "clarify" what mitigation steps needed to be performed. Def.'s Ex. 3 at 78-79. Mr. Mitchell disputes this characterization of what transpired and has presented evidence suggesting that the adjuster repeatedly asked the industrial hygienist for specific methods of remediation and was repeatedly told by the industrial hygienist that this was not information he could provide. *See* Pl.'s Resp. to Def.'s Undisputed Mat. Facts ¶ 18. It is not entirely clear whether or how the industrial hygienist's report was amended, but the report is dated September 9, 2020. *See* Def.'s Ex. 6.
[5] Mr. Mitchell asserts that this is significant because State Farm was aware that his son suffers from asthma.
[6] IICRC stands for Institute of Inspection Cleaning and Restoration Certification. The S520 applies to mold remediation.

there is a likelihood of adverse health effects on occupants, or when there is a need to determine that the water actually contains contamination. *Id.* at 39-40. The S500 also recommends specific and more extensive remediation steps that should be taken when dealing with a Category 3 water loss. *Id.* at 249-92.

After reviewing the industrial hygienist's report, State Farm concluded that the removal and cleaning of the building materials mentioned in the report was a covered loss, but the mold remediation and any additional living expenses associated with it were not covered under the policy. Def.'s Ex. 3 at 77-78. A letter memorializing this decision and indicating that State Farm would generate a repair estimate was sent to Mr. Mitchell on September 10, 2020. Def.'s Ex. 7. Covenant subsequently provided an estimate that was higher than its initial estimate, purportedly because the scope of work had increased. Covenant represented that its estimate included payment for steps that are recommended by the S500 when mitigating a Category 3 water loss and did not include separate mold or mildew cleanup. Def.'s Ex. 3 at 74-75; Pl.'s Ex. 25. After State Farm received the estimate, the adjuster conducted another inspection of the property with Mr. Mitchell and Covenant. Def.'s Ex. 3 at 75.

On October 27, 2020, State Farm provided its estimate for the water mitigation (but not the build-back) portion of the repairs. Def.'s Ex. 8. The estimate was significantly lower than Covenant's estimate. *Id.* The claim notes indicate that the work detailed in Covenant's estimate is not required "based off the engineer report" and that certain steps included in Covenant's estimate – such as reintroducing water when cleaning affected areas that were now dry – are "unreasonable." Def.'s Ex. 3 at 74. However, the industrial hygienist testified

that State Farm's conclusion about the scope of work recommended by his report "[m]akes no sense" and that State Farm's estimate "wouldn't appear to be" based on his recommendations if it did not include certain remediation processes identified in the S500. Pl.'s Ex. 5, Depo of Bagett, 110:20-111:13; 139:15-18. The claim notes also suggest that the adjuster made certain decisions about what to include in the estimate based off conversations with the industrial hygienist, but the industrial hygienist testified that he does not make specific recommendations regarding mitigation steps. *Id.* at 41:18-43:17; 146:6-149:4. State Farm's adjuster testified that the water loss was a Category 3 loss and that it should be remediated according to the S500's standards. Pl.'s Ex. 4, Depo of Bates, 21:5-7; 165:14-21. State Farm eventually produced an estimate for water mitigation and build back repairs that was significantly less than Covenant's estimate, and this lawsuit followed.

## STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id*. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id*.

## DISCUSSION

Mr. Mitchell contends that State Farm breached its duty of good faith and fair dealing by conducting an unreasonable investigation of his claim and making an

8

unreasonably low settlement offer. State Farm argues that it is entitled to summary judgment on this claim because the undisputed facts show that there is a legitimate dispute between State Farm and Mr. Mitchell as to the scope of mitigation work needed to repair the water damage.

Under Oklahoma law, an insurer has an implied duty to deal fairly and act in good faith toward its insured, and the violation of that duty gives rise to an action in tort. *Christian v. American Home Assurance Co.*, 577 P.2d 899, 904 (Okla. 1977). To succeed on a claim for the violation of the duty of good faith and fair dealing, a plaintiff must prove four elements: "(1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009). The "critical question" in this analysis "is whether the insurer had a good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding [or delaying] payment under the policy." *Id.* at 725 (internal quotation omitted) (alteration in original). *See also Badillo v. Mid Century Ins. Co.,* 121 P.3d 1080, 1093–94 (Okla. 2005) ("A central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing."). Thus, "[i]f there is a legitimate dispute concerning coverage or no conclusive precedential legal authority requiring coverage, withholding or delaying payment is not unreasonable or in bad faith." *Ball*, 221 P.3d at 725.

9

Under this standard, an insurer does not act in bad faith by disagreeing with an insured regarding coverage or the amount of loss or by resorting to a judicial forum. *Christian*, 577 P.2d at 905. Nor does an insurer act in bad faith when it engages in conduct that is merely negligent. *Badillo,* 121 P.3d at 1094. Importantly, however, under Oklahoma law, "if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *McCorkle v. Great Atl. Ins. Co*., 637 P.2d 583, 587 (Okla. 1981).

State Farm describes this case as nothing more than a difference of opinion between an insurer and an insured as to the scope of work necessary to mitigate a water loss claim. But viewing the facts and drawing all reasonable inferences in Mr. Mitchell's favor, there is evidence from which a reasonable juror could conclude that State Farm failed to deal with its insured fairly and in good faith. State Farm's adjuster testified that Mr. Mitchell's home suffered a Category 3 water loss and that it should be mitigated according to the S500's standards. The industrial hygienist hired by State Farm to assist it in evaluating the claim similarly concluded that the house experienced a Category 3 water loss and recommended that the mitigation work comply with the S500.

However, there is evidence that State Farm declined to cover certain mitigation steps outlined in the S500 and that it lacked a good faith basis for doing so. The claim notes reflect that State Farm's estimate was based (at least in part) on the industrial hygienist's report, but the industrial hygienist testified that the estimate was not consistent with his recommendations. There is also evidence that the adjuster made certain decisions about

what to include in the mitigation estimate based on statements by the industrial hygienist, but testimony from the industrial hygienist (when construed in Mr. Mitchell's favor) suggests that those statements were not made or at least not accurately recounted by the adjuster. Although failure to comply with an industry standard such as the S500 is not necessarily indicative of bad faith, a reasonable juror could conclude that State Farm unreasonably failed to follow its own expert's recommendations regarding the level of mitigation work necessary to effectively repair the damage.[7] Because at least some of the material facts are disputed and the reasonableness of State Farm's conduct is subject to different inferences, summary judgment with respect to Mr. Mitchell's bad faith claim is not appropriate. *See McCorkle*, 637 P.2d at 587.

State Farm also seeks summary judgment as to Mr. Mitchell's claim for punitive damages. For punitive damages to be allowed under Oklahoma law, "there must be evidence, at a minimum, of reckless disregard toward another's rights from which malice and evil intent may be inferred." *Badillo*, 121 P.3d at 1106 (emphasis in original). The basis for Mr. Mitchell's punitive damages request is his assertion that State Farm recklessly disregarded his rights by rejecting the industrial hygienist's recommendations and forcing his family to live in a mold-infested house. Viewing the record in the light most favorable to Mr. Mitchell, the genuine disputes of material facts related to Mr. Mitchell's bad faith claim also preclude a summary adjudication of the issue of punitive damages.

---

[7] State Farm asserts that remediation for mold and related living expenses are plainly not covered under the policy, but this is beside the point. Mr. Mitchell's bad faith claim is based on State Farm's allegedly deficient estimate to repair the water damage, not on its denial of a claim for mold.

11

## CONCLUSION

As explained above, the Court finds that genuine disputes of material facts preclude summary judgment on the issues raised. IT IS THEREFORE ORDERED that Defendant State Farm Fire and Casualty Company's Motion for Partial Summary Judgment [Doc. No. 30] is DENIED.

IT IS SO ORDERED this 28th day of September, 2022.

TIMOTHY D. DeGIUSTI
Chief United States District Judge